AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Virginia

MAY 2 6 2017

**UNDER SEAL**

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

THE PREMISES LOCATED AT
4616 Willow Run Dr., Annadale, Virginia 22003 ("Willow
Lane" or "Manlapaz Residence")

)
)
)
)
)
)

Case No. 1:17-SW-278

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 371, 1028(a)(7), 1343, 1956, 1957 26 USC § 7206(2) | Conspiracy to defraud the United States, identity theft, wire fraud, money laundering; aiding & assisting in the preparation of the false tax returns. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

AUSA Katherine L. Wong

Michael Wheeler, Special Agent, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Theresa Carroll Buchanan
United States Magistrate Judge

Date: _____05/26/2017_____

_____
*Judge's signature*

City and state: Alexandria, VA

Theresa C. Buchanan, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>THE PREMISES LOCATED AT<br>JBM Financial Services/Group, 6201<br>Leesburg Pike, Suite 405, Falls Church, VA<br>22044 ("JBM Office") and 4616 Willow Run<br>Dr, Annandale, VA 22003 ("Manlapaz<br>Residence") | Case Nos. 1:17-SW-278, 17-SW-279<br><br><br>**Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
### A SEARCH AND SEIZURE WARRANT

I, Michael J. Wheeler, being duly sworn, depose and declare the following:

### INTRODUCTION

1.      I am a Special Agent with Internal Revenue Service Criminal Investigation

(hereinafter, "IRS-CI") and have been so employed since July 2012.  Prior to July 2012, I was

employed by an international accounting firm for approximately three years.  I am a Certified

Public Accountant, a Certified Government Financial Manager, and a Certified Fraud Examiner.

I am also certified in Information Security Fundamentals.  My training has included financial

investigative techniques, accounting, tax, criminal investigation techniques, criminal law and

search warrants.  As an IRS-CI Special Agent, I investigate potential violations of the Internal

Revenue Code (Title 26), the Money Laundering Control Act (Title 18) and the Bank Secrecy

Act (Title 31).  By virtue of my training and experience, I am familiar with investigations

involving allegations and violations related to the preparation of false and fraudulent tax returns

(26 U.S.C. § 7206(2)), wire fraud (18 U.S.C. § 1343), conspiracy to defraud the United States

1

(18 U.S.C. § 371), money laundering (18 U.S.C. §§ 1956, 1957), identity theft (18 U.S.C. § 1028(a)(7)) and other white collar and financial violations.

## SUMMARY

2.    I make this affidavit in support of an application for search and seizure warrants for the following premises: 6201 Leesburg Pike Suite 405, Falls Church, Virginia 22044, which is the business location for JBM Financial Group/Services (hereinafter "JBM Office") and 4616 Willow Run Dr, Annandale, Virginia 22003 ("Manlapaz Residence" or "Willow Run") as more fully described in Attachment A.

3.    Based on the facts set forth herein, I submit there is probable cause to believe that Jose Benjamin Manlapaz, owner of JBM Financial Services, which now also goes by the name JBM Financial Group, committed the following offenses together with others known and unknown to the investigation: aiding or assisting in the preparation of fraudulent tax returns, in violation of 26 USC § 7206(2), conspiracy to defraud the United States, in violation of 18 USC § 371, wire fraud, in violation of 18 USC § 1343, identity theft, in violation of 18 USC § 1028(a)(7), and money laundering, in violation of 18 USC §§ 1956, 1957. Based on the information set forth herein, I submit there is probable cause to believe that evidence, fruits and instrumentalities of these offenses will be found at the above-described locations.

4.    This affidavit is based upon information gained by me from multiple sources; including but not limited to, recorded conversation and correspondence obtained during an undercover investigation, surveillance, a review of Internal Revenue Service (hereinafter, "IRS") databases, a review of Federal income tax return information, witness interviews, a review of records obtained from a search of JBM's offices in the same office building in May 2013, information received from other IRS personnel, and knowledge gained from my training and experience. Because this affidavit is written and offered for the limited purpose of establishing

2

probable cause for the issuance of search warrants, it does not contain all of the information that the Government possesses relative to this investigation.

## STATEMENT OF PROBABLE CAUSE

5.     It is the responsibility of the IRS Scheme Development Center (hereinafter, "SDC") to determine alleged fraudulent tax return schemes by identifying those returns that show characteristics of fraud.  Statistical analysis of returns prepared using the same electronic filing identification number and paid preparer name is performed by the SDC to determine if return preparers may be preparing fraudulent returns and making false claims for clients.

6.     In or around 2012 the SDC identified tax return preparer Manlapaz and his business JBM Financial Services/Group (hereinafter, "JBM") as having potentially fraudulent tax preparation activity.  At that time, JBM was located at 6201 Leesburg Pike Suite 218, Falls Church, Virginia 22044.  My investigation, including surveillance and witness interviews, has determined that Manlapaz and JBM still operate a tax preparation business, but that the location has moved to another office suite in the same building, which is one of the premises sought to be searched.  At this time, JBM's office in Virginia is located at 6201 Leesburg Pike Suite 405, Falls Church, Virginia 22044.

7.     Based on a statistical analysis of the tax returns prepared by Manlapaz and JBM between tax years 2008 and 2012, the SDC noted that Manlapaz and JBM may be claiming unsupported nonrefundable education credits and unsupported refundable American opportunity education credits on his clients' tax returns in order to reduce his clients' tax liabilities and/or provide his clients with a fraudulent tax refund.  It was alleged by the SDC that 78% of tax year 2011 tax returns prepared by Manalapaz and JBM claimed these nonrefundable and refundable education credits.  In addition, 99% of tax year 2009, 2010, and 2011 tax returns prepared by

3

Manlapaz and JBM resulted in tax refunds. Based on my training and experience and conversations with other IRS personnel, I know that these percentages are high and may be indicative of fraudulent activity in the preparation of the tax returns. The tax returns prepared by Manlapaz before August 2013 were typically filed electronically from the Eastern District of Virginia. They were identifiable because Manlapaz's PTIN, which is a unique number issued by the IRS and/or the information for JBM were listed on the returns. The SDC also was able to track returns and trace them to JBM based on the use of common factors such as email address and/or IP address, which is an identifier associated with a computer connected to the internet that can provide geographic location and information about the identity of the individual submitting the return. Specifically, a common IP address tends to indicate that the returns being filed from that address may be filed by the same individual or individuals.

8.      On or about March 21, 2013, an Undercover Agent (hereinafter, "UCA") walked into JBM at 6201 Leesburg Pike Suite 218, Falls Church, Virginia 22044 in an attempt to have an income tax return prepared by Manlapaz.

9.      Upon entering Suite 218, the UCA was greeted by a female employee. This female employee conducted intake procedures and the UCA provided their undercover personal information and a 2012 Form W-2 that was previously created by IRS-CI. After providing the required information, the UCA waited in the waiting area until it was his/her turn to meet with Manlapaz in his back office.

10.      Manlapaz eventually called the UCA into his office and explained that the UCA would owe approximately $500 if Manlapaz prepared the Federal income tax return correctly. Manlapaz asked the UCA if he/she needed money and then offered to provide the UCA with a

4

tax refund of approximately $1,900 by placing an education credit on their Federal income tax return.

11.    Manlapaz further explained what an IRS audit was and what the UCA should do if his/her Federal income tax return was audited. Manlapaz directed the UCA to bring any IRS audit correspondence to him and stated that he would respond to the audit on the UCA's behalf.

12.    If Manlapaz and JBM prepared the 2012 Federal income tax return correctly, the resulting tax due and owing would be approximately $520. Manlapaz and JBM instead placed $4,000 of fraudulent qualified education expenses on Form 8863, Education Credits, for the UCA which resulted in a $1,000 refundable American opportunity credit and a $1,500 nonrefundable education credit. These credits combined to provide the UCA with a Federal tax refund of $1,981. Form 8863 fraudulently indicates that the UCA incurred qualified education expenses with Stratford University at 7777 Leesburg Pike, Falls Church Virginia 22043. The UCA did not provide Manlapaz or JBM with information or documentation for these fraudulent education credits.

13.    The UCA paid a second female JBM employee $195 in cash and received an invoice stamped "PAID" in return. This second female employee also provided the UCA with a printed copy of his/her Federal and State income tax returns and informed the UCA that JBM will send copies of the tax returns to the residential address the UCA provided earlier.

14.    Manlapaz of JBM is listed as the paid preparer on the UCA's 2012 Federal tax return. Manlapaz is also listed as a third party designee; this authorizes him to discuss the tax return with the IRS.

15.    On or about May 15, 2013 IRS-CI conducted a search warrant of JBM and seized voluminous amounts of client files and other documents related to the preparation of tax returns.

5

Law enforcement also seized various lists of educational institutions that included the information necessary to claim education credits on tax returns such as educational institution names, addresses, and Employer Identification Numbers.

16.     During subsequent interviews of former JBM employees and based on a review of the May 2013 search warrant materials, I learned that JBM employees were taught how to prepare fraudulent tax returns claiming false items such as education credits, childcare expenses and false schedule Cs (businesses).  For example, former employee G.E. explained how s/he was trained by other JBM employees to use the list of educational institutions that JBM created and an online mapping tool to locate an educational institution close to a client's address.  JBM employees would then add this educational institution to the client's tax return data, regardless of whether or not the client actually attended a qualifying educational institution.  G.E. also explained how s/he was taught to claim certain amounts of education expenses.  Based on my knowledge, training, and experience I know that the amounts of education expenses G.E. was trained to claim sufficiently maximizes the benefit of the education tax credit.

17.     G.E. and other employees of JBM stated that many clients were likely unaware of what particular items were being added to their tax returns, because the addition of false items typically happened at the data entry stage (based on prior directions/office policy approved or set by Manlapaz), or thereafter, when Manlapaz was reviewing and/or finalizing the return.  G.E. stated that JBM employees would similarly add false childcare expenses if the taxpayer met certain criteria (for example, had school-age dependents), and would use a list of institutions and searches on the internet to locate a location close to the taxpayer's address. Failure to add childcare expenses could result in Manlapaz yelling at the employee, or threatening to fire him/her.

18.     I also know from interviews with taxpayers that some of the false items on returns prepared by JBM and/or Manlapaz included: education credits, childcare expenses, false schedule Cs, inflated charitable deductions, inflated expenses for rental properties claimed on the Schedule E, and false dependents.

19.     Furthermore, G.E. explained how s/he was consistently criticized by Manlapaz for not adding education credits to JBM client tax returns. G.E. stated that Manlapaz would often call him/her into Manlapaz's back office and berate him/her in front of clients for not adding education credits to their tax returns. When asked by law enforcement why G.E. did not add education credits as s/he was trained in order to avoid the continued scrutiny G.E. explained that s/he thought it was weird to add education credits on tax returns when the clients did not previously indicate that they attended an educational institution.

20.     During subsequent interviews of former JBM employees and based on a review of the May 2013 search warrant materials law enforcement learned that Manlapaz and JBM had a satellite office located in the Philippines that was managed by Diana Dela Cruz at the direction of Manlapaz. I have reviewed emails between Diana Dela Cruz and Manlapaz that were obtained through an email search warrant of JBM's business emails and obtained during the May 2013 search warrant of JBM. In these emails, Diana Dela Cruz sometimes lists her title as Chief Executive Officer ("CEO") for JBM.

21.     Through witness interviews, a review of the email search warrant results, and a review of records obtained during the 2013 search of the JBM office, I know that employees of JBM, including Diana Dela Cruz and other employees in the Philippines office of JBM would create false and fraudulent receipts and documents, including Forms 1098-T. Forms 1098-T are an IRS form that educational institutions issue to taxpayers to show qualifying education

7

expenses, so that the taxpayers can claim the expenses on their return. I have reviewed emails in which Diana Dela Cruz and Manlapaz are discussing the creation of such documents, and/or making corrections to such documents created in the Philippines, such as fixing typos. Former employees of JBM have also stated that the JBM office in Virginia would obtain such documents from the JBM offices in the Philippines, and that communication was typically via Skype or electronically, via email.

22.    I also know from witness interviews and that some of the falsified documents were mailed or otherwise sent to the IRS in response to "IRS Letters" (the JBM term) or IRS audits. The responses sent to the IRS were reviewed by Manlapaz and sent from the JBM offices. Former employees of JBM stated that they would be responsible for preparing draft responses, which Manlapaz would then review. For example, many of JBM's clients were audited by the IRS due to the false and fraudulent education credits claimed on their tax returns that were prepared by Manlapaz. In response to these audits, Diana Dela Cruz and other employees in the Philippines office would create false and fraudulent tuition statements, or Forms 1098-T, purporting to be from legitimate educational institutions located in the United States. According to clients of JBM, Manlapaz charged a fee to respond to IRS letters or audits.

23.    For example, former employee E.Q. explained how s/he would assist clients who would come into JBM with IRS audit letters. If a JBM client was audited due to education credits, E.Q. would email Diana Dela Cruz in the Philippines with the client name, an educational institution of JBM's choosing, the tax year, and the educational expense amount. In response, Diana Dela Cruz would email to E.Q. a false and fraudulent Form 1098-T that contained the exact information that E.Q. previously requested. E.Q. noted how Manlapaz

instructed him/her to pay close attention as to how the Forms 1098-T produced by Diana Dela Cruz appeared and to ensure that they looked as close to an authentic document as possible.

24.    Subsequent to the May 2013 search warrant, law enforcement interviewed multiple Manlapaz and JBM clients.  These clients identified false and fraudulent items on their tax returns for tax years 2008 through 2013.  Some clients who were interviewed further testified that they were still clients of Manlapaz and had discussions with him after the search of JBM offices in 2013.  Two clients stated that Manlapaz offered to help them if they were audited by the IRS; at least one client also told Manlapaz about his interview in 2014 with an IRS-CI special agent about tax returns prepared by JBM.  The client stated that he told Manlapaz what items the interview had focused on, which included the false education credits, charitable deductions and child care expenses.

25.    According to at least two clients, including E.C., Manlapaz and JBM have continued to prepare returns using largely the same procedure as before the 2013 search, with the primary difference being that they now file returns in paper and require clients to sign them.  Based on my review of IRS records, I know that Manlapaz and JBM are generally no longer listing Manlapaz or JBM's information in the "Paid Preparer" section, which makes it falsely appear that the returns are self-prepared.  Manlapaz and JBM are continuing to charge clients for the preparation of their tax returns, with a similar fee structure to before the 2013 search.

26.    Further, my investigation has revealed that Manlapaz has continued to prepare false and fraudulent returns for new and existing clients since the search in May 2013 through the present, and that JBM is still in operation.  In the case of E.C., Manlapaz continued to claim some of the same false items and credits on the returns prepared after the 2013 search by IRS-CI, after he knew that he was under criminal investigation.  In the case of E.C., for example, his

9

returns falsely list his filing status as "head of household," even though E.C. is married and

Manlapaz is personal friends with E.C. and E.C.'s wife. The returns for E.C. for tax years 2013

through 2016, all claim false dependents who are listed as foster children. My investigation has

revealed that the dependents claimed on the returns actually reside in the Philippines, and have

never been to the United States. They are not foster children. E.C. stated that Manlapaz was

aware of the true status of these dependents, because he told Manlapaz and that Manlapaz was

the one who suggested that E.C. obtain individual tax identification numbers ("ITINs") for these

individuals so that E.C. could claim them on his return and obtain a larger refund. E.C. stated

that Manlapaz charged a fee for submitting the applications for ITINs for the dependents on

E.C.'s return.

27.     My review of E.C.'s returns for tax years 2013 through 2016 shows that

Manlapaz has continued to claim the same false dependents. E.C. was interviewed by an IRS-CI

special agent in 2013. According to E.C., he told Manlapaz about the interview and the

questions asked about his dependents. Manlapaz, however, continued to falsely claim the

dependents on E.C.'s return. E.C. also stated that other items on his returns are false, including

certain expenses listed for his rental property. According to E.C. and other taxpayers, Manlapaz

would not go over the specifics of the return, or how he was precisely generating larger refunds.

Rather, he would focus on the refund amount and ask if the client was happy with it. If the

clients were not happy, Manlapaz would offer to make changes, but typically increase the fee as

the refund amount increased.

28.     My investigation has also revealed that E.C. was asked by Manlapaz to transmit

cash to the Phillipines by wire, in the amounts of $40,000 in or around August 2013 after the

search and $60,000 in or around September 2013. According to E.C., Manlapaz did not want to

send the wires in his name, so Manlapaz took E.C. to a money transmitter and listed E.C.'s

information on the form. E.C. stated that the information provided to the money transmitter in

August 2013 and September 2013 on these forms was false. E.C. stated the money was not his

and that the purpose listed – buying a farm – was not correct, because the farm was for

Manlapaz, not him. E.C. stated that Manlapaz has property and businesses in the Philippines.

The recipient listed on the wire was Diana Dela Cruz. Based on a review of financial institution

records, I know that Manlapaz regularly wired money to Diana Dela Cruz in the Philippines. I

also know that Manlapaz regularly visits the Philippines. Among the business discussed by

Diana Dela Cruz and Manlapaz in emails from the email search warrant and JBM search are

different foreign bank accounts in the Philippines and the movement of money to conduct

financial transactions in the Philippines.

      29.    In or around August 2016, the IRS received a complaint filed by taxpayer S.R.

stating that in or around March 2016 S.R. went to Manlapaz and JBM for tax preparation

services. S.R. stated that s/he did not provide Manlapaz or JBM with any information related to

education expenses because s/he attended school part-time under a full scholarship. When S.R.

reviewed the tax return that Manlapaz and JBM prepared s/he noted that it incorrectly claimed an

education credit and it incorrectly claimed that s/he attended George Washington University and

paid at least $4,000 of qualified education expenses. S.R. stated that JBM filed this false and

fraudulent tax return without his/her permission and s/he attempted to correct the issue for an

extended period of time.

      30.    S.R. stated that his/her spouse went to the JBM offices located at 6201 Leesburg

Pike in Falls Church to have the return prepared, based on the advice of a coworker who stated

that JBM was known for giving good refunds. S.R. stated that the spouse returned to the office

and asked JBM to correct the return, at which time a Form 1040X was prepared. This Form 1040X corrected the failure to report income from one Form W-2 and removed the education credit, but left other false items, including a daycare expense for a daycare that S.R.'s children did not actually attend, in an amount larger than the information provided to JBM. The explanation on the Form 1040X has a blank paid preparer section. The explanation on the Form 1040X for the amendment is written in a way to suggest that the taxpayer in fact prepared the Form 1040X, when, in fact JBM did. S.R. personally visited the JBM office after preparation of the fraudulent Form 1040X, in or about June 2016. S.R. stated that multiple employees were working at the office, and that he/she was initially greeted at a front desk, where they were taking information. S.R. stated that she saw a person who went by "Ben" who had been speaking loudly to a woman identified as a manager. S.R. identified the woman and "Ben" in a photograph posted on the Ben Manlapaz and JBM Financial Group Facebook page.

31.    S.R. also submitted to the IRS various marketing materials s/he obtained from JBM during the tax preparation process. These materials list Manlapaz as the company president and indicate that JBM is located at 6201 Leesburg Pike Suite 218, Falls Church, Virginia 22044.

32.    In or around February 2017, the IRS received a complaint filed by taxpayer Y.M. reporting that in or around January 2017 Y.M. went to Manlapaz and JBM for tax preparation services. Y.M. stated that s/he provided JBM with one Form W-2 and information about his/her dependents. Y.M. was then surprised when the tax return prepared by JBM claimed an education credit and claimed that a member of his/her household attended a local college. Y.M. noted that this information was incorrect. JBM asked Y.M. to sign and file the tax return; however, Y.M. said that s/he wanted to cancel the tax return instead of submitting it to the IRS. Y.M. paid Manlapaz and JBM approximately $695 for the tax return preparation service for which Y.M.

12

later filed a claim in small claims court. Y.M. noted that in response to his small claims court filing s/he was able to get his/her money back from JBM.

33.    Y.M. also submitted to the IRS various marketing materials s/he obtained from JBM during the tax preparation process. These materials list Manlapaz as the company president and indicate that JBM is now located at 6201 Leesburg Pike Suite 408, Falls Church, Virginia 22044. The same flier also states that the office has moved and is now located in the same building, but on the fourth floor in Suite 408.

34.    In or around May 2017, law enforcement visited 6201 Leesburg Pike Suite 408, Falls Church, Virginia 22044 and noted that it was an unmarked door located in close proximity to a door labeled "JBM Financial Group Suite 405". Both doors appear to access the same interior office space.

35.    In addition, the paid preparer section is blank on the S.R. and Y.M. tax returns prepared by Manlapaz and JBM. Generally, a paid tax return preparer includes his/her name, signature, date of signature, firm name, firm address, phone number, and other identifying information in the paid preparer section; however, since on or around May 2013 it appears that Manlapaz and JBM have failed to correctly complete the paid preparer section on the tax returns they have prepared. For example, former Manlapaz client E.F. went to Manlapaz and JBM for tax preparation services in or around March 2014. According to E.F. and based on a review of the tax return, Manlapaz and JBM prepared E.F.'s tax year 2013 tax return; however, the paid preparer section is blank. Based on my training, experience and conversations with other agents, I know that paid preparers will sometimes leave the "Paid Preparer" section blank in order to conceal or disguise their involvement in preparing the return, since it then makes the return appear to have been self-prepared.

13

36.     Law enforcement has identified an active Facebook account under the name of "Ben Manlapaz" that shows a profile picture of an individual that appears to be Manlapaz.  In another photo on that same Facebook account, there is a group picture.  Y.M. and S.R. identified "Ben" in the group photo, as well as other JBM employees that they recall seeing and interacting with at the JBM office.  Furthermore, there are a number of photos posted to this page that are marketing materials for JBM located at 6201 Leesburg Pike, Falls Church, Virginia 22044. Some of these photos appear to show the new JBM location of Suite 405.  A review of these photos show that the name "JBM Financial Group" is posted on the front door of Suite 405 in large letters.

### JBM OFFICE

37.     The JBM marketing materials obtain by S.R. in 2016 and Y.M. in 2017 both list ben.manlapaz@gmail.com as Manlapaz's contact email address.  A JBM marketing flier posted to the "Ben Manlapaz" Facebook account on or about April 25, 2017 indicates that clients can email their requests to ben.manlapaz@gmail.com.  A review of Google's records related to this email account shows that Internet Protocol address 70.167.242.34 (hereinafter, "IP 70") has accessed ben.manlapaz@gmail.com approximately more than 700 times from at least on or about January 1, 2013 through at least on or about May 28, 2013 and approximately more than 100 times from at least on or about November 21, 2016 through at least on or about April 30, 2017. According to Cox Communications' records, this IP address is a static IP address registered to "Ervice JBM Financial S" and "BEN MANLOPAZ" located at 6201 Leesburg Pike, Ste 408, Falls Church, Virginia 22044, the location of the JBM Office sought to be searched.  Based on my training, experience and conversations with other agents, I know that the log-in information for a business email account is indicative of where that individual may be located when using

14

and/or accessing that account. I know from reviewing email search warrant returns of another email account that Manlapaz previously used ben.manlapaz@gmail.com for JBM business that he frequently accessed the business email account during work hours.

38.    A review of IRS data shows that IP 70 filed approximately more than 400 tax returns with the IRS from 2011 through 2017. The most recent tax filings were transmitted to the IRS from IP 70 on or about April 22, 2017. During 2017, a majority of these tax filings are associated with email address jbmfg.info@gmail.com while others were associated with ben.manlapaz@gmail.com. A significant number of these tax filings list JBM Financial Group or JBM Financial Services as the tax preparation firm name. Former employees of JBM stated that returns are electronically filed with the IRS from the JBM office. Accordingly, I believe that it is likely that the computers at the current JBM office location will contain evidence regarding returns filed from that location, and/or other documentation tracking successfully filed returns.

39.    During the course of Y.M.'s 2017 visits to JBM located at 6201 Leesburg Pike Suite 405, Falls Church, Virginia 22044, Y.M. observed approximately 15 to 20 employees and approximately 50 to 60 clients inside JBM. Y.M. also observed numerous computers located throughout the office and Y.M. observed tax return documents inside Suite 405.

40.    Y.M., for example, stated that there was an area of the office devoted to client intake interviews, and that employees would meet with clients in this area to ask basic questions, such as name, social security number and to collect any paperwork provided by the client. Y.M. stated they also asked who referred him, and appeared to be verifying that information. Former employees have stated that verifying referrals was an important part of the intake process and required by Manlapaz. One of the ways that employees would verify the referral was by looking

up the purported referral in their client database, which is maintained on the JBM computer network.

41.    Y.M. stated that after his basic information was collected by a JBM employee, clients were directed to a waiting area. While there, Y.M. did not see his return being prepared, but did witness a person named "Ben" come out multiple times and speak with clients. When speaking to them, Ben would show them what appeared to be a post-it with something written on it, and discuss that number with the client. Sometimes after discussing with the client, Ben would return to his office and later come back to the client with another piece of paper. Y.M. stated the same process occurred as to him in or around January 2017. When Ben spoke to Y.M., the piece of paper had numbers on it indicating the refund amount that Y.M. was to receive. Ben asked Y.M. if the amount was enough; when Y.M. indicated that he was typically accustomed to receiving a higher refund, Ben left and returned with another post-it, this time with a higher refund amount. After further discussion, Ben increased Y.M.'s refund, but also indicated that Y.M. would have to pay a higher tax preparation fee. Y.M. agreed to pay the increased fee associated with the higher refund amount. Over the course of the discussions with Ben, Y.M.'s refund increased from approximately $4,000 to over $11,000. Y.M. stated that at no point during this process did Ben show him the return, and that he was only provided a copy when checking out and paying the preparation fee.

42.    Both Y.M. and S.R. stated there was an area of JBM where payments were processed. S.R.'s spouse paid part of the preparation fee with credit card and part with cash. According to former employees of JBM, JBM encourages clients to pay cash. The cash is handled by Manlapaz; the employee processing the payments performs a daily reconciliation, which is provided to Manlapaz. According to several former employees, Manlapaz pays some

employees in cash, particularly those who do not have work authorization and are not in the United States legally.

43.     Former employees stated that one of the services that Manlapaz offered/provided to employees was preparing their tax returns.  I have reviewed some of the tax returns for then-employees of JBM and found that they contain false items designed to fraudulently inflate their refunds, such as education credits, child care expenses, and fraudulent Schedule Cs.  In addition, Manlapaz would often fail to file employee Forms W-2 or Forms 1099 with the IRS.

44.     According to former employees, JBM had regular meetings, as often as once a week, when Ben would discuss and set forth policies that employees were supposed to follow.  A review of records from the 2013 search included hardcopies of meeting minutes, which former employees describe as a summary that was prepared based on what Ben had said.  Y.M. stated that when he returned to JBM on a Monday to talk about his tax return with Ben, he could hear a meeting taking place in a room near the lobby and had to wait until after it was finished to speak with Ben.  Y.M. stated that when he confronted Ben about the return, Ben stated that Y.M. had agreed to the return and then referred Y.M. to speak to a manager.

45.     When S.R. visited the JBM offices in or about June 2016, he/she stated that JBM kept copies of the returns prepared for S.R. and S.R.'s spouse, and provided a copy upon request.  S.R. stated that another taxpayer was there at the same time and had a similar complaint about false items on his/her return.  That taxpayer was escorted to a back room with a computer, where another JBM employee discussed the return with the taxpayer and explained that removing the item would cause the taxpayer to get less money from the IRS.

46.     The tax return preparation process described by S.R. and Y.M. is similar to the process prior to the search warrant in May 2013 as described by former employees, with the

17

exception that taxpayers no longer are generally brought into Manlapaz's office to discuss their taxes. According to former employees, Manlapaz only accepts referred clients because he is concerned about undercover federal agents, and verbalized this concern even before the search warrant. Former employees responsible for client intake interviews stated that JBM would have a client fill out a questionnaire, and would note on the questionnaires when a client was a return customer. I have reviewed records from the 2013 search warrant, which includes client questionnaires. Former employees also stated that during client intake they would make copies of client records and would frequently keep the original W-2s or 1099s and any Form 1098-Ts. Former employees stated that the original Form 1098-Ts were later scanned in and used to generate fraudulent Form 1098-Ts to substantiate fraudulent education credit claims. Further, before Manlapaz would review and sign off on a return, the data for a particular client would be entered in the computer, using particular software.

47.    Former employees stated that they were required to set up email addresses with Gmail for use at JBM, and that they frequently used email, chat and Skype to communicate. Employees stated that before the search, Diana Dela Cruz would frequently participate in the regular employee meetings via Skype. According to former employees, Diana Dela Cruz also assisted with obtaining ITINs for clients whose relatives were in the Philippines. Former employees stated that they would help clients fill out the Forms W-7 for the relatives who would be receiving ITINs. According to the employees, Manlapaz would review the applications, which generally included copies of the individual's foreign passport and birth certificate. Some former employees, who helped translate for clients who only spoke Spanish, stated that Manlapaz would promote the ITIN service and tell clients that they could claim relatives overseas if they sometimes sent those relatives money. IRS regulations, however, generally only

18

allow a taxpayer to claim dependents if those dependents in fact live with the taxpayer. According to former employees, Manlapaz would typically ask where the relative was and be told that the relative did not live in the United States, but was overseas. Manlapaz would nonetheless apply for ITINs on behalf of those relatives, then charge clients a fee to amend past returns and add the dependents.

48.     Based on a review of records for the 2013 search of the JBM office, I know that Manlapaz maintained individual files for each client. Manlapaz also kept records of ITIN applications submitted to the IRS and provided clients who hired JBM to obtain ITINs with an "engagement letter" outlining the nature and cost of the services.  Clients would also be provided with an invoice, copy of their return, and letter outlining their state and federal tax refunds.  I know from emails found in the email search warrant that clients would frequently email Manlapaz documents for use in preparing returns, email correspondence received from the IRS (including audit notices and requests for evidence), and also have discussions about their tax refunds and ways to increase the refund.  In at least some emails, Manlapaz is discussing particular ways to increase a client's refund, after initially disclosing how much the client would owe (if the return were prepared correctly).

49.     In August 2016, Manlapaz and his defense attorney met with the undersigned and an Assistant U.S. Attorney at the U.S. Attorney's Office in the Eastern District of Virginia. During the meeting, Manlapaz was allowed to watch a video recording in which he prepared a false and fraudulent return for an undercover agent.  During the meeting, Manlapaz was told that he was the target of a criminal investigation and that possible charges included aiding and assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2) and identity theft, based on him obtaining ITINs and then adding fraudulent dependents to returns.  Manlapaz

19

was also told that some of the fraudulent credits identified during the investigation were education credits, child care expenses, and false dependents. Manlapaz was also warned during the meeting to not prepare returns with these false items.

50.    A review of search warrant records found various ITIN applications prepared by Manlapaz, who was an acceptance agent for the IRS for ITINs from approximately 2008 through 2012. Search warrant records also show that Manlapaz kept copies of records provided by taxpayers, as well as correspondence with the IRS. Based on my training and experience, I know that return preparers typically keep records for past tax years for clients, particularly when they have return clientele. I also know that Manlapaz has multiple employees working for him, and uses computers to prepare the returns.

51.    There are a number of photos posted on the "Ben Manlapaz" Facebook page that are marketing materials for JBM located at 6201 Leesburg Pike, Falls Church, Virginia 22044. According to these Facebook posts, it would appear that JBM moved from Suite 218 to Suite 405 in or around November 2016. Law enforcement has reviewed the various photos posted to this account and noted a number of postings in November and December 2016 that appear to show the inside of Suite 405. According to these photos Suite 405 appears to be occupied office space with various cabinets and boxes within the suite. In addition, various photos posted in or around July 2016 show an occupied office space with various boxes, cabinets, and computers. These photos appear to show the interior of the JBM office.

52.    Based on my training, experience, and participation in this and other financial investigations, I know:

    a) Persons preparing tax returns for others in return for compensation are required by law to keep, for three years, a copy of the tax returns or a list of the names, identification numbers, and tax years, of taxpayers for whom tax returns were prepared (Title 26 U.S.C. Section 6107; Reg. Sec. 1.6107-1).

b) Accountants and return preparers generally keep books and records to include work papers, worksheets, journals, ledgers, financial statements, bank records, receipts, bank statements, checks, deposit tickets, contracts, invoices, billing statements, cash receipt and disbursement records, client correspondence and research files, powers of attorney, copies of tax returns, other forms prepared for clients, and documentation of the information provided by the taxpayer.

c) Accountants and return preparers often have computers and related software to schedule, compute, prepare, print, and store income tax returns and supporting documentation, forms, documents, and other information.

d) It is common for return preparers to make and maintain a copy of each return prepared.

e) Tax return preparers typically maintain records of returns prepared at their businesses.

### MANLAPAZ RESIDENCE

53.     At the time of the May 2013 search warrant of JBM, Manlapaz was living at 6637 Cardinal Lane, Annandale, Virginia 22003.  Since then my investigation, including surveillance and internet activity records, has determined that Manlapaz has moved to 4616 Willow Run Dr, Annandale, Virginia 22003.

54.     The JBM marketing materials obtain by S.R. in 2016 and Y.M. in 2017 both list ben.manlapaz@gmail.com as Manlapaz's contact email address.  A JBM marketing flier posted to the "Ben Manlapaz" Facebook account on or about April 25, 2017 indicates that clients can email their requests to ben.manlapaz@gmail.com.  A review of Google's records related to this email account shows that Internet Protocol address 96.255.164.125 (hereinafter, "IP 96") has accessed ben.manlapaz@gmail.com approximately more than 275 times from at least on or about November 18, 2016 through at least on or about April 30, 2017.  According to Verizon's records, IP 96 is registered to Christina Frayna (hereinafter, "Frayna") located at 4616 Willow Run Dr, Annandale, Virginia 22003 since on or about October 6, 2016 through at least on or about May 8, 2017.  According to IRS records, Frayna and Manlapaz file joint personal income tax returns

21

and are married. Verizon's records also indicate that service in Frayna's name at 6637 Cardinal Lane ended on or about August 5, 2015.

55.    During the May 2013 search warrant of JBM law enforcement recovered various emails from the electronic devices located on-site. One email dated on or about April 2, 2008 was sent by Manlapaz to an individual E.D. Manlapaz instructed E.D. that he is providing a current layout of the "home" and "office" connections. Manlapaz suggested that E.D. configure the "Joseph server" and the "Benji computer" to test the connections. Manlapaz told E.D. that E.D. lost the connection in the "Virginia office" and that the connection could not be lost again prior to April 15th as client files would need to be accessible. Attached to this email is a handwritten schematic that depicts a "VA office" with various items that appear to be computers connected to the internet. The schematic also shows a separate "Home office" section that shows "Joseph" and "Benji comp" connected to the internet. Based on a review of Manlapaz's personal income tax returns it appears that he has a son named Joseph. Based on my training and experience, I know that businesses that have to store a great deal of their own data, and/or maintain their own website, will often maintain a server on which to back up the materials, particularly if employees work from multiple locations. Further, servers are typically stored in secure locations, such as an office or private residence. JBM operates a website and has thousands of clients, all of which have separate records. Further, Diana Dela Cruz works on clients located in Virginia from the Philippines. Given that she must work remotely, I believe that there is a common server through which she accesses client data.

56.    According to former employees, Manlapaz would take boxes of client files with him when he left the office in Falls Church, and it was understood that he was working on them from home. During his/her time employed by Manlapaz, former JBM employee E.Q. noted that

22

Manlapaz would sometimes work from home. E.Q. understood that Manlapaz was working from home because his/her managers would mention that Manlapaz was not in the office, but was working from home. In addition, E.Q. would sometimes video chat with Manlapaz to discuss JBM operations and noted that Manlapaz appeared to be in a bedroom. E.Q. was physically located in the JBM office during these video chats. E.Q. recalls seeing a bed behind Manlapaz and recalls seeing Manlapaz once putting on his shoes. E.Q. was employed by Manlapaz and JBM during or around 2013. More recently, in 2017 and 2016, I know that Manlapaz was not always in the JBM office during regular business hours. For example, Y.M. was told that Manlapaz was not in the office when trying to make an appointment to see him in early 2017.

57.     I know from my training and experience that individuals engaged in criminal activity frequently keep and maintain records in areas that are private, such as their residences. In addition to the JBM office in Virginia, I know from the emails obtained by search warrant that Manlapaz is in regular contact with the office in the Philippines, which is approximately 12 hours ahead of the time in Virginia.

58.     Part of this investigation is focused on tracing the proceeds of JBM and identifying conspirators and associates in the United States and overseas. Some of the emails to Diana Dela Cruz are outside of normal JBM office hours and/or before the hour that former employees report Manlapaz as regularly reporting or staying in the office. For example, numerous emails from Manlapaz to Diana Dela Cruz are time stamped as early as during the 5:00 am hour and as late as the 11:00 pm hour. In addition, I have reviewed numerous emails that were sent on Saturdays and Sundays. Based on the times on the emails, I believe that Manlapaz is conducting at least some business from his home. I have also seen fund transfer requests that are dated in the evenings, including after 9:00 pm or 11:00 pm. Based on the

timestamps on these email confirmations, I believe that Manlapaz is also conducting financial transactions while in the Manlapaz residence. Based on my training and experience, I know that individuals who work from home typically maintain some records at their residence.

59.    Based on my investigation, Manlapaz's sole business in the United States is JBM. As a United States citizen, Manlapaz is required to file annual reports with the U.S. Treasury if he maintains foreign accounts that he owns or controls and that have a total balance in excess of $10,000 US dollars. Based on records found during the search in 2013 and a JBM flyer in 2016 advertising continued operations in the Philippines, I believe that Manlapaz has and is maintaining one or more foreign bank accounts. Bank records for U.S. bank accounts show multiple wires to the Philippines. Manlapaz is required to report any foreign bank accounts meeting the requirements described above on his individual income tax returns.

60.    For example a statement of account from November 2012 for a BPI account in the name of "Manlapaz & Associates" that was sent by Diana Dela Cruz via email shows a balance of over 419,000 Philippines Pesos, which at the time was more than $10,000 U.S. dollars. This account should have been reported on Manlapaz's return and in an FBAR filing with the U.S. Treasury. Based on emails between Diana Dela Cruz and Manlapaz that include copies of bank account records, I believe that Manlapaz has and is maintaining numerous accounts at the Bank of the Philippine Islands. Some of these accounts appear to be in the name of Manlapaz or related entities and some of these accounts appear to be in the name of Manlapaz's employees located in the Philippines. Based on my training and experience, I know that the use of nominees is one way that individuals will attempt to conceal and/or disguise the location, source or true ownership of funds.

61.     As a return preparer, Manlapaz would be familiar with the requirement to file a Report of Foreign Bank and Financial Accounts ("FBAR") with the U.S. Treasury. Such a report is required annually for any taxpayer that has a financial interest in or signature authority over a foreign financial account if the balance during the year exceeds $10,000.

## COMPUTERS AND ELECTRONIC STORAGE

62.     As described above and in Attachment B, this application seeks permission to search and seize records that are believed to be present at the JBM Office located at 6201 Leesburg Pike Suite 405, Falls Church, Virginia 22044, and Manlapaz Residence located at 4616 Willow Run Dr, Annandale, Virginia 22003, in whatever form the records are found. Your affiant submits that if a computer or electronic medium is found on the premises, there is probable cause to believe some of the items sought to be seized will be stored in that computer or electronic medium.

63.     The belief that some of the evidence, fruits or instrumentalities of the crimes under investigation will be found on computers, phones or other electronics is based upon my training, experience and evidence gathered during the course of this investigation. This evidence includes statements by former employees that client records were stored electronically; IRS records showing that returns have been filed electronically from 2011 through 2017 listing JBM as the preparer from a static IP address currently registered to JBM; email communications from an email search warrant between Diana Dela Cruz, Manlapaz and other employees; flyers and advertisements inviting clients to email Manlapaz and listing other electronic mail addresses for other employees; Google and Verizon records showing that Manlapaz accesses his professional work email address from his residence; the likely existence of a server and computer related to JBM operations located in the Manlapaz residence; the need to communicate and share

documents between the JBM office in Virginia and the Philippines; emails from Diana Dela Cruz referring to documents that she can access on the server; employees discussing scanning in copies of client documents; clients in 2016 and 2017 describing computers located throughout JBM; the processing of client payments using credit cards and the regular practices of large tax preparation shops; the service of responding to IRS audit letters and inquiries, which requires keeping old files and materials for clients, and the use of templates, such as false and fraudulent Forms 1098-T.

64.    Based on my training, experience and conversations with agents familiar with the storage of information on computers, I also know that metadata on computers can help identify which computers were used to create and/or access certain files, and that different computers may have different files on them, depending on if files are stored locally or on the network. My investigation has also indicated that Manlapaz appears to generally use a particular office and computer, but has access to data entered by JBM employees, which is again indicative of a computer network and shared file system. Based on witness interviews and their description of the tax preparation process, as well as a review of returns prepared after the 2013 search, I know that returns prepared by JBM are continuing to claim the same false items, including education and daycare expenses. The location of the educational institutions and daycare listed on the returns again appears to be based on the taxpayer address, suggesting the data entry employees are currently using the same processes to make the false entries. Further, because many returns are now being submitted in paper format, accessing the files at JBM is necessary to determine what records were provided by clients and what returns were actually prepared at JBM. Given that Y.R. recalled hearing a regular weekly meeting, I believe that the meeting notes will likely

provide important information about the roles of different employees, including their knowledge
and authority in the tax preparation process.

65.     Based on your affiant's knowledge, training, and experience and consultations
with an IRS-CI Special Agent Computer Investigative Specialist who has extensive training in
collecting and analyzing computer evidence, I know that:

a)  Computer storage devices such as hard disks can store the equivalent of millions of
    pages of information.  Criminals can mislabel or hide files and directories, encode
    communications to avoid using key words, attempt to delete files to evade detection,
    or take other steps designed to frustrate law enforcement searches for information.
    These steps may require agents and law enforcement or other analysts with
    appropriate expertise to conduct more extensive searches, such as scanning areas of
    the disk not allocated to listed files, or peruse every file briefly to determine whether
    it falls within the scope of the warrant.

b)  The most forensically sound, effective, and complete way to analyze data from the
    computer is to create an electronic "image" of the computer media.  As "imaging" is
    not always possible or practical, a computer specialist will decide whether to employ
    this or another method.

c)  "Imaging" is the taking of a complete electronic picture of the computer's data,
    including all hidden sectors and deleted files designed to protect the integrity of the
    evidence.  "Imaging" a computer permits the computer specialist to obtain an exact
    copy of the computer's stored data.  The computer specialist will then analyze data
    from the "mirror image" copy.  "Imaging" is preferable to searching and extracting
    files from a hard drive because in many cases, search techniques may not yield the
    evidence described in the warrant.  Additionally, computer evidence is vulnerable to
    inadvertent or intentional modification or destruction (both from external sources or
    from destructive code imbedded in the system as a "booby trap").  Therefore, a
    controlled environment is preferential to conduct an accurate and safe analysis.  In
    light of these difficulties, IRS-CI intends to conduct its searches offsite and use
    whatever data analysis techniques appear necessary to locate and retrieve the
    evidence described in Attachment B.

d)  Computer files or remnants of such files can be recovered months or even years after
    they have been downloaded onto a hard drive, deleted or viewed via the Internet.
    Electronic files downloaded to a hard drive can be stored for years at little or no cost.
    Even when files have been deleted, they can be recovered months or years later using
    readily available forensics tools.  This is so because when a person "deletes" a file on
    a computer, the data contained in the file does not actually disappear; rather, that data
    remains on the hard drive until it is overwritten by new data.

e) Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

f) Files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

g) Some types of data are hardware dependent and need a piece of hardware, such as an encryption key for a software program to run or data to be accessed. In these cases, it is necessary to seize the required hardware or encryption key to access this data.

h) Cellular telephones, personal digital assistants (PDAs), smart phones, and tablets are computer type devices capable of creating, storing, and transmitting electronic data and are believed to contain some of the evidence described in the warrant. For example, most of these devices contain address books, correspondence in the form of e-mails & text messages, electronic receipts, photographs that may identify assets and associates, and other documents found on computers and in paper form. Because of the vast number of different devices on the market, and the complexity of analyzing some of the devices, I hereby request the Court's permission to seize these or similar devices and to "image" or analyze the device(s) off-site. Upon completion, the government will return the equipment within a reasonable time.

## CONCLUSION

66.    Based on my training and experience and the facts set forth herein, I submit there is probable cause to believe that Manlapaz and others known and unknown to the investigation have violations of 18 USC 371 (conspiracy), 18 USC 1028(a)(7) (identity theft), 18 USC 1343 (wire fraud), 18 USC 1956, 1957 (money laundering), 26 USC 7206(2) (aiding and assisting in the preparation of false tax returns).

67.    I further submit that there is probable cause to search the JBM Office located at 6201 Leesburg Pike Suite 405, Falls Church, Virginia 22044 and Manlapaz Residence located at 4616 Willow Run Dr., Annandale, Virginia 22003, with the location to be searched more fully described in Attachment "A," and that these locations will contain evidence, fruits and

instrumentalities of these crimes, as further described in Attachment "B." As such, I respectfully request that a search warrant be issued for the location at 6201 Leesburg Pike, Suite 405, Falls Church, Virginia 22044 and location at 4616 Willow Run Dr., Annandale, VA 22003.

_____
Michael J. Wheeler
Special Agent, IRS-CI

Subscribed and sworn to before me this ⟨26⟩ day of May, 2017.

/s/
Theresa Carroli Buchanan
United States Magistrate Judge

_____
Honorable Theresa C. Buchanan
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>THE PREMISES LOCATED AT<br>4616 WILLOW RUN DR, ANNANDALE,<br>VIRGINIA 22003 ("WILLOW RUN" or<br>"MANLAPAZ RESIDENCE") | Case No. 1:17-SW-278<br><br>**Under Seal** |

## ATTACHMENT A
## LOCATION TO BE SEARCHED

The premises to be searched is the real property located at 4616 Willow Run Dr,

Annandale, Virginia 22003 ("Willow Run" or "Manlapaz Residence"), which is further

described as single-family, detached residence with a reddish-colored brick exterior. The

windows and door appear to have a light colored wood trim and there is a chimney stack located

on the south-end of the residence. The residence has a driveway located on the north-end of the

property that leads to an attached garage. Pictures of the residence are shown below.







View of front of residence          Aerial View of Residence

1

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | Case No. 1:17-SW-278 |
| THE PREMISES LOCATED AT 4616 WILLOW RUN DR, ANNANDALE, VIRGINIA 22003 ("WILLOW RUN" or "MANLAPAZ RESIDENCE") | **Under Seal** |

## ATTACHMENT B
## ITEMS TO BE SEIZED

The items to be seized consist of the following fruits, instrumentalities, and evidence of illegal activity, for the time period January 1, 2007 to present, relating to violations of Title 26, United States Code, Section 7206(2) (Aiding or assisting in the preparation of fraudulent tax returns), Title 18, United States Code, Section 371 (Conspiracy to defraud the United States), and Title 18, United States Code, Section 1343 (Wire fraud), Title 18, United States Code, Section 1956 and 1957 (Money Laundering), and Title 18, United States Code, Section 1028(a)(7) (Identity Theft), including but not limited to the following:

1.     Records, documents, and materials relating to federal or state tax preparation and reference materials to include but not limited to: copies of the IRS Tax code, IRS Publications, materials from tax-related seminars or courses, and any correspondence relating to IRS forms or IRS statutes or regulations, and tax schedules;

2.     Records of any current, past or attempted registrations or certifications held or sought by Jose Benjamin Manlapaz, JBM Financial Services/Group ("JBM") and/or current or former employees of JBM, including but not limited to: registration for electronic filing

1

("EFIN"), internal compliance checks or visits by the IRS to JBM, tax preparer identification numbers ("PTIN"), or certified acceptance agent ("CAA") applications, paperwork or compliance information for ITINs.

3.    Records, documents, and materials relating to the training of employees of JBM Financial Services/Group, or Jose Benjamin Manlapaz to include but not limited to: manuals, templates, internal memos, meeting notes, instructions, and directives.

4.    Retained copies of client tax returns and files as well as back-up documentation to all client tax returns (including for businesses or entities owned/controlled by clients) prepared by Jose Benjamin Manlapaz and/or JBM to include but not limited: federal and state tax returns, together with all forms, schedules and attachments that accompany those tax returns, client questionnaires, copies of client-provided documents, email correspondence with employees or the taxpayer/client, draft returns, internal memos or invoices, print-outs from JBM databases or records showing dates of preparation, data entry and identity of preparer(s).

5.    Records, documents, and materials related to the preparation of all client tax returns to include: documentation from clients, documentation for deductions, forms provided to Jose Benjamin Manlapaz and/or JBM by clients or other third parties to prepare tax returns, client questionnaires and worksheets;

6.    Records, documents, and materials showing receipt of payment from clients to include but not limited to: receipts, receipt books, journals, credit card transaction/merchant account information, Quickbooks or other internal software, or ledgers whether hardcopy or electronic;

7.    Records, documents, and materials showing correspondence between Jose Benjamin Manlapaz and/or JBM, and tax clients or federal/state tax authorities related to tax

preparation, tax accounting or tax, audits, IRS letters requesting documentation or other tax matters whether civil or criminal;

8. Records, documents, and materials related to agreements between Jose Benjamin Manlapaz or JBM Financial Services/Group and current or former employees, contractors or interns to include but not limited to: employee contracts, payment records, timesheets, ledgers, payroll, personnel files, records of trainings, certifications held by employees, severance agreements, Forms 1099 or W-2, employment tax returns for JBM or any related entities including Forms 940 and 941 or state employment tax returns;

9. Records, documents, and materials related to the compensation of Jose Benjamin Manlapaz and/or the control, ownership or profits/gross receipts earned by JBM to include but not limited to: articles of incorporation, financial records, bank account records, receipts, ledgers, cash receipt books, statements, bank books, checkbooks, journals, wire information, and payroll records;

10. Records, documents, and materials reflecting names, addresses, or telephone numbers of tax business associates or clients to include but not limited to: telephone books, address books, mailing/holiday gift lists, or other items reflecting names or other identifying information;

11. Records, documents, or other materials reflecting summary sheets, commission logs and payments logs that assist in identifying co-conspirators and JBM clients, as well as the roles of different individuals within JBM and related entities, to include but not limited to organization charts, workflow information, log-in or access records to the server or databases maintained by JBM, such as for the data entry.

12.    Records showing the role and responsibilities of JBM employees, interns or associates in the Philippines, including but not limited to emails, chats, documents or files (hardcopy or electronic).

13.    Records related to the preparation and submission of Forms W-7, ITINs and their use by JBM, Jose Ben Manlapaz and/or clients of JBM, including but not limited to instruction manuals, lists of clients, correspondence with the IRS, client files, copies of applications, correspondence regarding the submission/approval or denial.

14.    Records related to any audits, letters from federal or state tax authorities, or submissions on behalf of JBM, Jose Ben Manlapaz or clients of JBM, including but not limited to internal correspondence among JBM employees, draft responses, supporting documents, and records showing the origin/source of any supporting documentation, including records that may identify the creator of such items.

15.    Cash or any cash equivalents, including foreign currency.

16.    Any records of cash deposits, wires or electronic transmission, including those made by or on behalf of JBM or Jose Ben Manlapaz, such as by third parties, to include but not limited to transactions in the name of third parties.

17.    Any records of foreign bank accounts in which JBM, related entities or Jose Ben Manlapaz has an interest, ownership or otherwise exercises control, including accounts held in the Philippines and any documentation related to the opening of such accounts, account balances, nominees, access, use or control of such accounts, or related to the filing of reports (or failure to file) with the U.S. Treasury regarding such foreign assets, including FBARs, documentation regarding the requirements for filing FBARs, or evidence of research regarding the FBAR requirement or clemency programs related to failure to file such reports.

4

18.    Any records to currency transaction reporting requirements, including with respect to foreign or domestic wire transactions.

19.    Any back-up or archived copies of JBM records, to include databases of past returns, past employee files or emails, or other records regarding the historic ownership or control of JBM and internal policies/procedures for preparing tax returns.

20.    Any records related to the criminal investigation of JBM or Jose Manlapaz or similar criminal tax investigations, including but not limited to materials from the U.S. Attorney's Office for the Eastern District of Virginia, copies or records of research conducted regarding criminal tax violations/penalties, or internal reviews of client files.

21.    Data contained in cell phones or similar electronic devices, including but not limited the address book (Contacts), calendar, call logs, photographs and videos, audio files, tasks, GPS data, internet data, chat logs, e-mail, SMS (Text) and MMS messages, voicemail contained on the device, memos, notes, and documents or other electronic files listed above.

The above paragraphs, 1 through 21, include all the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stored, including any handmade form (such as writing); any photocopies; any mechanical form (such as printing, or typing); any electrical, electronic, or magnetic form or data (such as any information on an electronic or magnetic storage device as further described below).

The terms "records," "documents," and "materials" include all of the following items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created and stored, to include: any handmade form (such as writing or drawing with any implement on any surface, directly or indirectly); and

photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion

pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing);

and any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact

discs, hard drives or drives, CD-ROMs, optical discs, printer buffers, smart cards, memory

calculators, electronic dialers, Bernoulli drives, cellular telephones, personal digital assistants

(PDAs), smart phones or electronic notebooks, as well as printouts or readouts from any

magnetic storage device).

13.    Items and the content of items related to electronic devices that are capable of

storing, analyzing, creating, displaying, converting or transmitting electronic or magnetic

computer impulses or data that is contained in this warrant. These devices include:

      a.    Computers, computer components, computer peripherals, modems, monitors, printers, plotters, copiers, fax machines, optical scanners, external hard drives, and other computer related electronic devices;

      b.    Instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, and other programs of software used to communicate with computer hardware or peripherals; information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. This media includes floppy disks, diskettes, fixed hard disks, removable hard disk cartridges, flash "thumb" drives and similar devices, tapes, video cassettes, and any other media which is capable of storing magnetic coding;

      c.    Digital cameras and digital camera storage cards;

      d.    Cellular telephones, PDAs, tablets, and other smart phones and their storage cards;

      e.    Passwords, encryption keys, and other access devices that may be necessary to access the above devices or media; and

      f.    Written or printed material that provides instructions or examples concerning the operation of any of the above devices, media, or software.